# EXHIBIT 11

## REDLINE COMPARISON OF FIRST AMENDED COMPLAINT AGAINST SECOND AMENDED COMPLAINT

UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | |
|---|---|
| NICHOLAS CLARK,<br><br>        PLAINTIFF,<br><br>v.<br><br>THOMAS HANLEY, PETER MURPHY, KIMBERLY WEIR, KEVIN MANLEY, ~~ANGEL~~ ROBERTO QUIROS, AND JOHN/JANE DOES 1–9,<br><br>        DEFENDANTS. | Case No. 3:18-CV-01765-JAM<br><br><br>~~August~~ November ~~1~~16, 2020 |

### ~~FIRST~~ SECOND AMENDED COMPLAINT

### SUMMARY OF THE ACTION

1.      Plaintiff Nicholas ("Veronica May") Clark, an incarcerated transgender woman, was the victim of sexual assault by Defendant Thomas Hanley, a former corrections officer and General Maintenance Officer at MacDougall-Walker Correctional Institution located in Suffield, Connecticut ("MacDougall-Walker").

2.      As set forth in Mr. Hanley's Criminal Information, dated January 17, 2013 ("Criminal Information"), annexed hereto as **Exhibit A**, and the Affidavit of Connecticut State Trooper Paul DaCruz in Support of the Application for Mr. Hanley's Arrest Warrant, dated November 14, 2011 ("DaCruz Aff."), annexed hereto as **Exhibit B**, Mr. Hanley repeatedly sexually assaulted Ms. Clark across several weeks in 2011.  Mr. Hanley pleaded guilty to these criminal acts on January 17, 2013, and served four months in prison.

3. Mr. Hanley's criminal assaults of Ms. Clark violate Connecticut law and MacDougall-Walker's own policies, and constitute cruel and unusual punishment in violation of the Eighth Amendment of the U.S. Constitution.

4. Mr. Hanley's repeated criminal sexual assaults could have and should have been prevented. Mr. Hanley had been flagged for serious misconduct by officials at MacDougall-Walker well before his assault campaign. For example, the State of Connecticut Department of Correction ("DOC") initiated a formal investigation of Mr. Hanley in 2010 that confirmed that Mr. Hanley was a ringleader of a long-running contraband smuggling ring and had a dangerous propensity to seek to abuse his authority to sexually assault inmates. These findings were reported to high-level officials at MacDougall-Walker as early as 2010, including the following Defendants: MacDougall-Walker's Warden, Peter Murphy; the DOC's Director of Security, Kimberly Weir; personnel within MacDougall-Walker's Intelligence and Security Unit, including Kevin Manley and ~~Angel~~ Roberto Quiros; and John/Jane Does 1–9 (collectively, "MacDougall-Walker Defendants").

5. Despite knowing of Mr. Hanley's wide-ranging misconduct and dangerous proclivity, the MacDougall-Walker Defendants acted with deliberate indifference toward Ms. Clark's safety. Not only did they fail to take any meaningful steps to protect inmates from Mr. Hanley, they maintained and enforced policies that enabled Mr. Hanley to have unfettered and unmonitored one-on-one access in areas of the facility that were known to lack surveillance to Ms. Clark, as well as other inmates, directly leading to inmate assaults. The MacDougall-Walker Defendants were each personally involved in depriving Ms. Clark of her Eighth Amendment rights by failing to take the appropriate actions to protect her and other inmates from Mr. Hanley,

resulting in Mr. Hanley's criminal sexual assaults of Ms. Clark and other MacDougall-Walker inmates.

## JURISDICTION AND VENUE

6. Ms. Clark brings claims pursuant to 42 U.S.C. § 1983 and the Eighth Amendment to the United States Constitution.

7. This Court has jurisdiction pursuant to 28 U.S.C. §§ 1331 and 1343.

8. Jurisdiction over Ms. Clark's state law claims is proper pursuant to 28 U.S.C. § 1367.

9. Venue is proper under 28 U.S.C. § 1391(b)(2).

## PARTIES

10. Ms. Clark is a transgender woman who has lived in various parts of the Northeast. Ms. Clark is currently incarcerated at Cheshire Correctional Institution in Cheshire, Connecticut, and was previously incarcerated at MacDougall-Walker; Corrigan-Radgowski Correctional Center ("Corrigan") in Uncasville, Connecticut; and Garner Correctional Institution ("Garner") in Newtown, Connecticut. At all relevant times, Ms. Clark was an inmate at MacDougall-Walker and, as such, in the custody of the DOC.

11. Defendant Thomas Hanley was a corrections officer and General Maintenance Officer at MacDougall-Walker until January 2013, when his employment was terminated, and he was criminally convicted of three counts of fourth degree sexual assault for his sexual assaults of Ms. Clark.[1] At all relevant times, Mr. Hanley was acting under color of state law, and is being sued in his individual capacity for damages.

---

[1] Although Mr. Hanley was not convicted of it, his arrest was supported by probable cause that he had also committed Sexual Assault in the second degree. *See* DaCruz Aff. ¶ 15.

12. Defendant Peter Murphy served as the Warden of MacDougall-Walker from 2007 through 2014. At all relevant times, Mr. Murphy was acting under color of state law, and is being sued in his individual capacity for damages.

13. Defendant Kimberly Weir served as the DOC's Director of Security during all relevant times. At all relevant times, Ms. Weir was acting under color of state law, and is being sued in her individual capacity for damages.

14. Defendants Captain Kevin Manley and Captain ~~Angel~~ Roberto Quiros were formerly part of MacDougall-Walker's Intelligence and Security Unit. At all relevant times, Defendants were acting under color of state law, and are being sued in their individual capacities for damages.

15. Defendants John/Jane Does 1–9 represent any other individuals who acted under color of state law, and knew of and personally played a role in depriving Ms. Clark of her constitutional rights. Ms. Clark reserves the right to pursue claims against John/Jane Does 1–9 in their individual capacities for damages and their official capacities for declaratory and/or injunctive relief.

## FACTUAL BACKGROUND

### Ms. Clark's Incarceration at MacDougall-Walker

16. In November 2007, Ms. Clark began her incarceration at MacDougall-Walker.

17. Following her arrival at MacDougall-Walker in 2007, drawing on her prior experience working as an electrician, Ms. Clark was asked to assist the facility's general maintenance department with various electrical projects. In that role, she reported to Mr. Hanley, who was the General Maintenance Officer and was responsible for supervising general maintenance department workers.

Officials Learn of Mr. Hanley's Broad Misconduct

18.     While Mr. Hanley "officially" served as a corrections officer and General Maintenance Officer, as of at least 2007, the year Ms. Clark began her incarceration at the facility, Mr. Hanley was also running an elaborate contraband smuggling ring within MacDougall-Walker's walls.  Mr. Hanley supplied inmates with contraband such as illegal narcotics and alcohol in exchange for payment.

19.     In September 2010, the DOC's Security Division/Investigation Unit and MacDougall-Walker's Intelligence and Security Unit launched a joint investigation into Mr. Hanley's illicit conduct.  The investigation included the use of informants and covert recording devices.

20.     In the course of its investigation, DOC's Security Division/Investigation Unit and MacDougall-Walker's Intelligence and Security Unit also uncovered that Mr. Hanley had sought to engage (and was continuing to seek to engage) in improper sexual contact with inmates.

21.     The MacDougall-Walker Defendants participated in and/or were apprised of the progress of the investigation, through which they learned that Mr. Hanley sought to engage in and/or was engaging in improper sexual contact with inmates.  For example, on December 14, 2010, a memorandum authored by another worker in MacDougall-Walker's Intelligence and Security Unit (the "First Memorandum"), annexed hereto as **Exhibit C**, was addressed and circulated to Defendants Mr. Murphy and Mr. Quiros.  The First Memorandum concerned the activities of an informant referred to as SOI #47, who, like Ms. Clark, reported to Mr. Hanley in the general maintenance department.  It documented that Defendants Mr. Quiros and Mr. Manley spoke with SOI #47 concerning improper sexual advances from Mr. Hanley.  Specifically, SOI #47 was reported to have stated that on December 9, 2010, Mr. Hanley approached him in

MacDougall-Walker's laundry room, put his arms around him, and asked if he wanted to touch his penis.

22. On December 20, 2010, Mr. Quiros notified Ms. Weir of Mr. Hanley's sexual advances toward SOI #47 on December 9, 2010 in a second memorandum (the "Second Memorandum," and, collectively with the First Memorandum, the "Memoranda"), annexed hereto as **Exhibit D**. He also apprised her of the ongoing investigation.

23. As reflected in the Memoranda, following SOI #47's report, Mr. Quiros ordered SOI #47 to avoid sexual contact with Mr. Hanley and not to initiate discussions with Mr. Hanley that were of a sexual nature. Mr. Quiros expressed to SOI #47 that if Mr. Hanley attempted to make physical contact with SOI #47, he should immediately contact individuals in the MacDougall-Walker Intelligence and Security Unit. Despite the incidents set forth in the Memoranda, Mr. Hanley remained employed by DOC at MacDougall-Walker in the same capacity as before.

24. Upon information and belief, this investigation shows that, by as early as December 2010, the MacDougall-Walker Defendants clearly understood or should have understood that Mr. Hanley posed a danger to inmates, and in particular to inmates like SOI #47 and Ms. Clark who were under Mr. Hanley's supervision in the general maintenance department. For example, Mr. Quiros' directive to SOI #47 shows that, based on the investigation, he clearly understood that SOI #47 was placed directly in harm's way by being in Mr. Hanley's presence.

25. Not only did Mr. Hanley present a clear danger to inmates, and especially to inmates like Ms. Clark who worked in the general maintenance department, Mr. Hanley's sexual advances, known to the MacDougall-Walker Defendants as early as 2010, clearly violated the then-operative version of DOC Administrative Directive 6.12, effective August 15, 2009, annexed

hereto as **Exhibit E**, which established a "zero tolerance policy on sexual assault."[2] The zero-tolerance policy in effect at the time expressly applied to employees, such as Mr. Hanley.

26. Yet upon information and belief, prior to Mr. Hanley's sexual assaults of Ms. Clark in 2011, no actions were taken to limit or prevent Mr. Hanley's contact with MacDougall-Walker's inmates in general, including those under his supervision in the general maintenance department. This failure to take any action to limit Mr. Hanley's contact with inmates reflects a deliberate indifference to their safety.

27. To the contrary, as described below, the MacDougall-Walker Defendants put in place and maintained policies that enabled Mr. Hanley to prey on inmates, even after the danger that he posed to inmates was clear. These policies directly led to a string of sexual assaults that Mr. Hanley perpetrated upon Ms. Clark while she was incarcerated at the MacDougall-Walker.

### The "Off Count" Policy

28. At all relevant times, MacDougall-Walker maintained a so-called "off count" policy, which Mr. Hanley used to get Ms. Clark alone and sexually assault her.

29. At MacDougall-Walker, "counts" take place every day at noon and 3 p.m. During "counts," inmates are called to return to their respective housing units to be accounted for. As noted on MacDougall-Walker's standard "off count" sheets, examples of which are annexed hereto as **Exhibit F**, certain staff members are permitted to place inmates on an "off count" sheet, provided that the staff member "identifies the inmate." Once inmates on an "off count" sheet have been "identified," they are required to "remain in the area where they were 'off counted' until the institutional count is cleared."

---

[2] Included in the definition of "Sexual Assault" set forth in DOC Administrative Directive 6.12 is the term "Staff Sexual Harassment," which is defined as "[a]ny behavior or act of a sexual nature directed toward an inmate by an employee, volunteer, official visitor, or other agency representative, to include sexual relationships of a romantic nature between staff and inmates." Exhibit E ¶ 3(D),(.F).

7

30.     MacDougall-Walker's so-called "off count" policy is ripe for abuse in that it enables correctional officers to separate inmates from the general population – unaccounted for – and shield the inmates, along with any correctional officer left alone with them, from any oversight.

### Inmate Tracking Policy

31.     As explained above, the "off count" policy is implemented only at the time "counts" take place at noon and 3 p.m. each day.

32.     At all other times, as described in the DaCruz Affidavit, MacDougall-Walker did not maintain a system, including but not limited to forms or other documentation, designed to regularly keep track of when an inmate was under the supervision of specific staff members, including Mr. Hanley.

33.     MacDougall-Walker's failure to keep track inmate supervision by staff is ripe for abuse in that it enables correctional officers to separate inmates from the general population – unaccounted for – and shield the inmates, along with any correctional officer they are alone with, from any oversight.

### Mr. Hanley's Repeated Sexual Assaults of Ms. Clark

34.     Despite Mr. Hanley's known danger to inmates, his authority to invoke the off count policy that would enable him unfettered, private, and unsurveilled access to inmates, such as Ms. Clark, was never revoked.  Nor was MacDougall-Walker's inmate tracking policy otherwise altered to address this known danger.  Rather, at all relevant times Mr. Hanley wielded authority to continue to gain one-on-one access to Ms. Clark, and other inmates, in areas of the facility known to lack surveillance.[3]

---

[3] As stated in the DaCruz Affidavit, Mr. Hanley's "sexual assaults took place [in] areas [of MacDougall-Walker] that are not monitored by video surveillance." ¶ 11.

8

35. As documented in the DaCruz Affidavit, Mr. Hanley began his serial sexual assaults of Ms. Clark in April of 2011. On at least four occasions that took place over several weeks in mid-2011, Mr. Hanley used his power and authority to sexually assault Ms. Clark by taking advantage of MacDougall-Walker's easily exploitable "off count" policy, and each transgression involved a similar modus operandi: Mr. Hanley used his authority as head of the general maintenance department to ensure that Ms. Clark was placed "off count." Often Mr. Hanley pretended that Ms. Clark was needed to assist with maintenance projects. Once "off count," however, he repeatedly secluded Ms. Clark and then sexually assaulted her. He also used the same easily exploitable "off count" policy to gain access to two other inmates, who, based on information and belief, served as "lookouts" (the "Lookouts") during several of his sexual assaults of Ms. Clark.

36. The DaCruz Affidavit documents Mr. Hanley's escalating abuse of Ms. Clark:

- In an initial encounter in April 2011, Mr. Hanley aggressively and inappropriately rubbed Ms. Clark's feet. While Mr. Hanley was touching Ms. Clark's feet, he started to breath intensely and made strange noises.

- A few days later, Mr. Hanley preyed upon Ms. Clark while she was "off count" and alone with Mr. Hanley and one of the Lookouts in a secluded laundry room. Mr. Hanley led her to an area behind the dryers and sexually assaulted her, including by touching her genitals.

- Mr. Hanley's next sexual assault of Ms. Clark took place approximately a week after the first, again, while Ms. Clark was "off count." Mr. Hanley cornered her at the shop where they worked. With the Lookouts also present in the shop, Mr. Hanley sexually assaulted Ms. Clark, forcing her to touch his genitals.

9

- Mr. Hanley's next reported sexual assault took place approximately a week later. Mr. Hanley took advantage of MacDougall-Walker's off count policy by feigning the need for Ms. Clark to assist with certain repair work. In reality, Mr. Hanley took Ms. Clark to a secluded area behind the showers known to be unsurveilled, alone, while the same two other inmates waited outside, upon information and belief, as lookouts. While the Lookouts stood watch, Mr. Hanley walked up to Ms. Clark and sexually assaulted her, including rubbing her genitals and making her touch his genitals.

- Mr. Hanley's final sexual assault reported in the DaCruz Affidavit took place approximately a few days to a week after the third reported sexual assault, again while Ms. Clark was placed "off count." He led Ms. Clark into a storage closet located in the laundry room, with the Lookouts in the same room close by, then sexually assaulted her, including touching her genitals over her verbal protests.

37. As documented in the DaCruz Affidavit, and reflected in Mr. Hanley's plea, Ms. Clark was not a willing participant in Mr. Hanley's sexual assaults.

38. Mr. Hanley's sexual assaults were not only criminal, but also in clear violation of MacDougall-Walker's next iteration of its zero-tolerance policy on sexual assaults, Directive 6.12, which became effective April 1, 2011, annexed as **Exhibit G**.[4]

### Mr. Hanley's Continued Misconduct, Resignation, Arrest and Conviction

39. Following Mr. Hanley's assaults of Ms. Clark, Mr. Hanley's misconduct continued.

---

[4] This iteration of MacDougall-Walker's policy defines "Sexual Assault" as including, but is not limited to, any "intentional touching, either directly or through the clothing of the genitalia, anus, breasts, inner thigh or buttocks of another person without his or her consent … and any unwanted and/or forced kissing and hugging." Exhibit G ¶ 3(A).

10

40. As documented in the DaCruz Affidavit, on July 29, 2011, not long after Mr. Hanley's final sexual assault of Ms. Clark, he asked the Lookouts, who, upon information and belief, stood watch as Mr. Hanley assaulted Ms. Clark, to film him engaging in sex acts with a new inmate reporting to him in the general maintenance department.

41. Mr. Hanley was recorded with the new inmate on several occasions.

42. According to one video transcript, annexed hereto as **Exhibit H**, one of the Lookouts said, "Hey Hanley you want me to run over there and choke him [an inmate] out? Rip his clothes off and rub your naked body all over him. Is that what you want? You like his feet? How do you like his feet Hanley? You want me to zero in on his feet Hanley?" Minutes later, one of the Lookouts is heard saying "Yo Hanley, listen to me, this kid, Hanley, this kid is fucking clueless, I hope you can hear me when your [sic] at home cause this kid is fuckin stupid. Give me a month I will have his clothes off." A couple minutes after that, an inmate states "Your game is weak Hanley we're gonna [sic] teach you how to run him."

43. Recordings of other inmates' phone calls to their family members from around this time, which was part of the investigation into Mr. Hanley's transgressions, suggest that Mr. Hanley had engaged in an improper relationship with at least one other inmate, too.

44. For example, according to the Incident and Disciplinary Reports relating to, and containing a transcript of, a conversation between an unidentified inmate and his mother on August 15, 2011, excerpts of which are annexed hereto as **Exhibit I**, the inmate appears to tell his mother that Mr. Hanley "was bringing him shit that he wasn't supposed to have" and "doesn't care about him." Later in the conversation, in response to the inmate's mother's apparent mentions of Mr. Hanley, the inmate says "[w]hy do you keep talking about this man, I don't give a fuck, he was

just something extra and I never really needed him." Not long after this comment, the inmate tells his mother, "if he ever sees [Mr. Hanley] again he will kill him."

45. Mr. Hanley was finally placed on leave and resigned shortly thereafter in August 2011, after having repeatedly assaulted Ms. Clark.

46. Upon information and belief, as a result of the assaults, Mr. Hanley was arrested on December 22, 2011, and pleaded guilty to three counts of sexual assault in the fourth degree (pursuant to Connecticut General Statutes § 53a-73a(a)(1)(F)) on January 17, 2013.

The Aftermath of the Assaults

47. The string of sexual assaults at the hands of a prison official deeply and profoundly scarred Ms. Clark, making it difficult for her to carry out ordinary functions, let alone process her assaults and attempt to secure justice while incarcerated. Indeed, following Ms. Clark's assaults, she has been repeatedly hospitalized for threat of suicide and to treat other trauma.

48. The shame and trauma of the assaults caused Ms. Clark to initially decline to reveal the assaults when questioned by authorities. Eventually she told officials about the sexual assaults, and asked them to transfer her to another facility. Ms. Clark was transferred to Corrigan around September 2011.

49. Ms. Clark's stay at Corrigan was brief and distressing. Ms. Clark suffered physical and mental abuse from her cellmate, compounding the trauma from the serial sexual assaults.

50. Fearing for her health and safety, Ms. initiated a hunger strike to seek to bring about a transfer to another facility.

51. Ms. Clark was subsequently transferred in January 2012; but unfortunately, that transfer was back to MacDougall-Walker—the location of her sexual assaults.

52. Upon her return to MacDougall-Walker, Ms. Clark's situation further deteriorated. The corrections officers referred to her as "gross," "nasty," and "disgusting" for being a victim of Mr. Hanley's sexual assaults in clear violation of the zero-tolerance policy in effect at the time. The emotional abuse at the hands of those who knew of and facilitated her prior abuse proved too much for Ms. Clark to bear.

53. In or around February 2012, Ms. Clark initiated another hunger strike. During a visit with a MacDougall-Walker physician, Ms. Clark begged to be transferred out of MacDougall-Walker due to the abuse that she suffered there. Ms. Clark stated to the physician that if she was forced to remain at MacDougall-Walker, she would kill herself.

54. In response to Ms. Clark's potential suicide, Ms. Clark was transferred to an inpatient psychiatric facility at Garner. Ms. Clark was placed on suicide watch and carefully evaluated.

55. Unfortunately, this also proved to be a short stay. After just around two weeks at Garner, around March 2012, Ms. Clark was discharged from the inpatient facility and was transferred to Cheshire.

56. At Cheshire, inmates openly mocked Ms. Clark's assaults, diminishing them as "gay stuff" with Mr. Hanley. Compounding the trauma, at Cheshire, Ms. Clark encountered corrections officers who had worked at MacDougall-Walker at or around the time of the sexual assaults.

57. Officials at Cheshire also repeatedly denied Ms. Clark medical and mental healthcare she needed to treat her gender dysphoria. Officials refused to offer any assistance to help her live in accordance with her gender identity. This caused Ms. Clark severe and debilitating psychological and physical pain.

58. In July 2016, after years of suffering due to denial of appropriate care, Ms. Clark partially self-castrated with a pair of nail clippers. She was unable to complete her self-castration due to profuse bleeding.[5] Ms. Clark was rushed to a University of Connecticut medical facility. Hours after being admitted, Ms. Clark was transferred to MacDougall-Walker's medical facility where she was hospitalized and was declared to be at risk for self-harm.

59. In or about September 2016, Ms. Clark was transferred to Garner, where she remained incarcerated as of the time she initiated steps to bring this suit in 2017, culminating in her filing this action in 2018.[6]

60. As is evident when considering the totality of the foregoing exceptional circumstances, Ms. Clark was not in a position to seek justice any earlier than when she did.

**CLAIMS FOR RELIEF**

**First Cause of Action: Eighth Amendment, Cruel and Unusual Punishment, Under 42 U.S.C. § 1983 (Sexual Assaults)**

**(Thomas Hanley)**

61. Ms. Clark incorporates by reference each and every allegation contained in the preceding paragraphs as if set forth fully herein.

62. Mr. Hanley sexually assaulted Ms. Clark on at least four separate occasions in April 2011.

63. Mr. Hanley's actions served no cognizable or conceivable penological purpose.

---

[5] Ms. Clark has a pending lawsuit in which she addresses these concerns. *See Clark v. Cook*, Case No. 3:19-cv-00575-VLB (D. Conn.).
[6] Ms. Clark was transferred back to MacDougall-Walker yet again in March 2020. In April 2020, Ms. Clark was transferred to Cheshire, and is currently housed at that correctional facility.

64. The actions taken by Mr. Hanley demonstrate that he acted with a sufficiently culpable state of mind to commit the assaults, and his behavior is objectively considered harmful and egregious enough to reach constitutional dimensions.

65. The actions taken by Mr. Hanley violated clearly established law.

66. By the foregoing actions, Mr. Hanley violated Ms. Clark's Eighth Amendment right to be free from cruel and unusual punishment.

**Second Cause of Action: Eighth Amendment, Cruel and Unusual Punishment, Under 42 U.S.C. § 1983 (Deliberate Indifference)**

**(Peter Murphy, Kimberly Weir, Kevin Manley, ~~Angel~~ Roberto Quiros, John/Jane Does 1–9)**

67. Ms. Clark incorporates by reference each and every allegation contained in the preceding paragraphs as if set forth fully herein.

68. Each of the MacDougall-Walker Defendants had a state of mind of deliberate indifference towards Ms. Clark's safety, which directly caused Ms. Clark to be incarcerated under conditions that posed a substantial risk of serious physical and mental harm. This is evidenced by the fact that, although each knew of Mr. Hanley's propensity to seek to engage in sexual misconduct with his general maintenance department workers before Ms. Clark was repeatedly assaulted, none took any affirmative action whatsoever in order to prevent Ms. Clark from being assaulted.

69. The MacDougall-Walker Defendants were each personally involved in depriving Ms. Clark of her Eighth Amendment rights. They each received, authored, or contributed to the Memoranda, which documented Mr. Hanley's misconduct, and they were all aware of the MacDougall-Walker policies, including the "off count" policy, that enabled Mr. Hanley's conduct, as well as the absence of a system in place to track to which staff member an inmate is assigned at

all other times, and yet were still deliberately indifferent to the substantial risk of Ms. Clark being sexually assaulted.  Additionally, due to his position as the Warden of MacDougall-Walker, Mr. Murphy was specifically responsible for maintaining the "off count" policy which gave Mr. Hanley the opportunity to commit the assaults in the first place.

70. The MacDougall-Walker Defendants' actions and inactions described above violated clearly established law.

71. Therefore, each of these Defendants' deliberate indifference violated Ms. Clark's rights pursuant to the Eighth Amendment, and their actions constitute cruel and unusual punishment.

### Third Cause of Action: Intentional Infliction of Emotional Distress Under Connecticut Law

### (All Defendants)

72. Ms. Clark incorporates by reference each and every allegation contained in the preceding paragraphs as if set forth fully herein.

73. Mr. Hanley should have known that the sexual assaults he perpetrated were likely to inflict emotional distress upon Ms. Clark.

74. The MacDougall-Walker Defendants knew of the substantial risk that Mr. Hanley would continue to assault his workers given that he sought to engage in sexual acts with at least one other inmate previously without any timely repercussion.  Naturally, it would be expected that emotional distress would result from a corrections officer assaulting an inmate.

75. Mr. Hanley's assaults were extreme and outrageous especially considering that he was a corrections officer and Ms. Clark's work supervisor whose ostensible responsibility was to protect her.

76. The MacDougall-Walker Defendants' failure to act in the face of Mr. Hanley's reported misconduct constitutes extreme and outrageous conduct since they knew of his propensity to engage in sexual misconduct and could have prevented it.

77. As a result of the sexual assaults, Ms. Clark still suffers from the severe psychological trauma that Defendants' actions and/or inactions caused.

78. By the foregoing actions, Defendants are responsible for the intentional infliction of Ms. Clark's severe emotional distress pursuant to Connecticut law.

**Fourth Cause of Action: Recklessness, Under Connecticut Law**

**(All Defendants)**

79. Ms. Clark incorporates by reference each and every allegation contained in the preceding paragraphs as if set forth fully herein.

80. Mr. Hanley engaged in reckless conduct by consciously placing Ms. Clark on "off count" lists, even though he very well understood that his actions subjected Ms. Clark to being in a position where he could assault her.

81. The MacDougall-Walker Defendants each knew that Mr. Hanley posed a serious threat to other inmates, yet, made the conscious choice not to prevent him from continuing to regularly perform his job responsibilities, including but not limited to stripping Mr. Hanley of the authority to invoke the "off count" policy.  There were well-documented facts presented to each of the MacDougall-Walker Defendants that they chose to disregard, which ultimately led to Ms. Clark being assaulted.

82. Considering the circumstances, Defendants' conduct was highly unreasonable and was an extreme departure from ordinary care.

83. By the foregoing actions, Defendants engaged in reckless conduct pursuant to Connecticut law.

### Fifth Cause of Action: Intentional Sexual Assault, Under Connecticut Law

### (Thomas Hanley)

84. Ms. Clark incorporates by reference each and every allegation contained in the preceding paragraphs as if set forth fully herein.

85. On four different days, Mr. Hanley approached Ms. Clark, brought her to a secluded and unsurveilled area within the MacDougall-Walker facility, and sexually assaulted her before she could leave the secluded area.

86. Mr. Hanley's sexual assaults of Ms. Clark are objectively offensive and violate Connecticut law as reflected in the Criminal Information and Mr. Hanley's plea.

87. By the foregoing actions, Mr. Hanley engaged in the intentional sexual assault of Ms. Clark pursuant to Connecticut law.

### PRAYER FOR RELIEF

WHEREFORE, Ms. Clark prays for judgment against the Defendants:

(a) Declaring that Defendants have violated Ms. Clark's right to be free from cruel and unusual punishment under the Eighth Amendment of the U.S. Constitution;

(b) Declaring that Defendants have violated Ms. Clark's rights pursuant to Connecticut law for committing Intentional Infliction of Emotional Distress, Recklessness, and Intentional Sexual Assault;

(c) Awarding Ms. Clark compensatory damages for Defendants' constitutional and state law violations, including, but not limited to, Ms. Clark's past and future pain and suffering;

(d) Awarding Ms. Clark punitive and nominal damages;

(e) Awarding Ms. Clark any costs and reasonable attorneys' fees available, including those pursuant to 42 U.S.C. § 1988; and

(f) Granting such other monetary, equitable, or other relief as is authorized by law and as the Court deems just and proper.

Plaintiff seeks a jury trial on all issues so triable.

Respectfully submitted,

*/s/ Benjamin H. Diessel*
Benjamin H. Diessel (ct30383)
WIGGIN AND DANA LLP
One Century Tower, P.O. Box 1832
New Haven, CT, 06508-1832
Telephone: 203-498-4400
Facsimile: 203-782-2889
bdiessel@wiggin.com

*Counsel for Plaintiff*