**UNITED STATES DISTRICT COURT**
**DISTRICT OF CONNECTICUT**

| | |
|---|---|
| VERONICA-MAY CLARK,<br>　　　*Plaintiff*,<br><br>　　v.<br><br>THOMAS HANLEY, PETER MURPHY,<br>KIMBERLY WEIR, KEVIN MANLEY,<br>ROBERTO QUIROS, AND JOHN/JANE<br>DOES 1–9,<br>　　　*Defendants*. | No. 3:18-cv-1765 (JAM) |

### ORDER DISMISSING COMPLAINT

The plaintiff in this case is a state prisoner who seeks money damages arising from her sexual abuse by a prison employee. She was abused in 2011 but did not file this lawsuit until more than seven years later in 2018. The question is whether this lawsuit is barred by the 3-year statute of limitations that governs her claims.

The answer is yes. After conducting an evidentiary hearing, I conclude that the plaintiff has not carried her burden to establish grounds for equitable tolling of the statute of limitations. She has not shown that extraordinary circumstances prevented her from timely filing this action or that she acted with reasonable diligence to do so. Therefore, I will grant the defendants' motions to dismiss.

### BACKGROUND

Plaintiff Veronica-May Clark filed a *pro se* complaint in October 2018 to seek money damages arising from her sexual abuse by a prison employee—defendant Thomas Hanley—who assaulted her in 2011.[1] Because of the 3-year statute of limitations that applies to a federal

---

[1] Doc. #1 (complaint). When this action was filed, the plaintiff's name was Nicholas Clark, and the Court recently granted her motion to amend the case caption to reflect her December 2021 name change. Doc. #102.

constitutional claim under 42 U.S.C. § 1983, I entered an order *sua sponte* dismissing the complaint on the ground that it was time-barred by the statute of limitations.[2]

Clark appealed, arguing that she could show that the statute of limitations should be equitably tolled on the basis of her "contention that the terror and harassment that Appellant allegedly experienced after the assault were extraordinary circumstances that prevented Appellant from filing the complaint within the limitations period."[3] The Second Circuit remanded for me to consider Clark's equitable tolling arguments and further stated that "the district court should consider whether the appointment of pro bono counsel is appropriate."[4]

I appointed *pro bono* counsel, and Clark has filed an amended complaint.[5] According to the amended complaint, Hanley repeatedly sexually assaulted Clark in 2011, and Hanley in turn pleaded guilty to these assaults in 2013.[6] Clark alleges that the remaining defendants—Peter Murphy, Kimberly Weir, Kevin Manley, and Robert Quiros—were prison officials who failed to prevent Hanley's assaults.[7] Clark alleges claims under 42 U.S.C. § 1983 for cruel and unusual punishment under the Eighth Amendment (Counts One and Two) as well as state law claims for intentional infliction of emotional distress (Count Three), recklessness (Count Four), and intentional sexual assault (Count Five).[8]

---

[2] Doc. #11; *Clark v. Hanley*, 2019 WL 319398 (D. Conn. 2019).

[3] Doc. #18 (order of the Second Circuit).

[4] *Ibid.*

[5] Doc. #26 (order appointing counsel); Doc. #47 (second amended complaint). I also granted Hanley's motion for appointment of counsel because he no longer works for the Department of Correction and could not afford counsel. Docs. #36-38. The remaining defendants are represented by the Office of the Attorney General of Connecticut. Doc. #61.

[6] Doc. #47 at 1 (¶ 2).

[7] *Id.* at 2 (¶¶ 4-5).

[8] *Id.* at 14-18 (¶¶ 61-87).

As to the issue of whether this action was timely filed, the amended complaint does not allege any wrongful act by any named defendant that occurred after Hanley came under investigation and resigned from his employment in August 2011.[9] The amended complaint, however, includes additional allegations about the impact of the sexual assaults on Clark, her fragile mental condition and gender dysphoria, and her mistreatment by unnamed prison officials and inmates during the years *after* the assault, all of which—according to the complaint— constitutes "exceptional circumstances" that rendered Clark "not in a position to seek justice any earlier than she did" when she first filed her complaint in October 2018.[10]

The defendants have moved to dismiss on the ground that Clark's claims are barred by the statute of limitations and that Clark has not alleged adequate grounds for equitable tolling.[11] After considering the parties' submissions and hearing oral argument, I was convinced that I could not resolve the fact-laden issue of equitable tolling on the basis of the parties' papers and arguments alone; I concluded instead that it was appropriate to allow discovery with respect to the issue of equitable tolling and then to conduct an evidentiary hearing.[12] And so I conducted an evidentiary hearing at which I heard the testimony of Clark and considered numerous exhibits.[13]

The testimony and exhibits from the evidentiary hearing establish the following background facts that are relevant to an assessment of Clark's equitable tolling claim. Clark is serving a 75-year prison sentence following her plea of guilty in Connecticut Superior Court to

---

[9] *Id.* at 11 (¶ 45).

[10] *Id.* at 12-14 (¶¶ 47-60).

[11] Docs. #67, #69, #70.

[12] Doc. #87; *Clark v. Hanley*, 2021 WL 4192108 (D. Conn. 2021).

[13] Doc. #96 (minute entry); Doc. #100 (transcript); *see also* Doc. #94 (plaintiff's sealed exhibits); Doc. #95 (plaintiff's unsealed exhibits). To the extent that this ruling references or quotes from certain exhibits that were filed under seal for reasons of medical confidentiality, Clark has very much put her condition at issue in this lawsuit, and it is necessary for me to describe certain aspects of her prison health records.

charges of murder, assault, and burglary.[14] She was known as "Nicholas Clark" at the time of her arrest and conviction, and she has been serving her sentence at men's prison facilities in Connecticut.

Shortly after Clark's arrest in 2007, she was incarcerated at MacDougall-Walker Correctional Institution (MacDougall) and remained there through the end of August 2011.[15] While at MacDougall, Clark worked as an electrician along with defendant Thomas Hanley, who was then employed at MacDougall as a general maintenance officer.[16]

During the middle of 2011, Hanley sexually assaulted Clark five times.[17] These encounters involved oral sex on one occasion and mutual masturbation on four occasions.[18] According to Clark, none of these encounters involved the use of physical force.[19] Clark said that "Hanley did not threaten me to perform any sexual acts but said he would take [care] of me by feeding me well. I kind of felt obligated into engaging in the sexual acts with Hanley."[20]

Clark did not report the assaults to prison officials and initially refused to speak to prison investigators but then later described the assaults to investigating officers of the Department of Correction's Intelligence Unit, including defendant Kevin Manley.[21] This in turn led to Clark being interviewed on August 22, 2011 by the Connecticut State Police, at which point she

---

[14] Doc. #95-19 at 27 (Pl. Ex. 18); Doc. #100 at 105.

[15] Doc. #100 at 11; Doc. #95-3 at 2 (Pl. Ex. 2).

[16] Doc. #100 at 14-15.

[17] *Id*. at 11-12, 16.

[18] Doc. #95-2 at 3-4 (¶ 5) (Pl. Ex. 1) (arrest warrant affidavit with written statement by Clark describing each encounter with Hanley).

[19] *Ibid*.

[20] *Id*. at 4 (¶ 5).

[21] *Id*. at 2-3 (¶ 4); Doc. #100 at 17-18.

described the assaults in extensive detail.[22] The Connecticut State Police in turn included Clark's

statements in an application for Hanley's arrest.[23]

Soon after Clark was interviewed by the Connecticut State Police, she was transferred out

of MacDougall. Prison records reflect numerous facility transfers for Clark before she filed this

action in October 2018:

- Nov. 30, 2007 to Aug. 30, 2011 – MacDougall-Walker Correctional Institution (CI)
- Aug. 30, 2011 to Dec. 19, 2011 – Corrigan Radgowski CI
- Dec. 19, 2011 to Jan. 10, 2012 – MacDougall-Walker CI
- Jan. 10, 2012 to Jan. 23, 2012 – Garner CI
- Jan. 23, 2012 to July 15, 2016 – Cheshire CI
- July 15, 2016 to July 27, 2016 – MacDougall-Walker CI
- July 27, 2016 to Oct. 26, 2018 – Garner CI[24]

Clark testified at the evidentiary hearing before me about why she did not file this lawsuit

until October 2018, more than seven years after the last assault occurred in August 2011.  In

essence, she claimed two reasons for delaying the filing of her lawsuit—because of her fear of

retaliation and because of the trauma she had experienced:

> Q. Okay. And we'll walk through this in a bit more
> detail, but at a high level could you explain to the Court
> some of the main reasons why, despite having been
> assaulted in 2011, you brought this suit in October 2018?
>
> A. Yes. I was afraid of the COs [correctional officers] and the staff and
> retaliation for filing the lawsuit.
>
> Q. And any other reasons that you want to talk about
> now?
>
> A. Yeah. It was like really traumatizing, everything
> that happened. It was just a nightmare. I don't know how
> to describe it other than that.[25]

---

[22] Doc. #100 at 20-22; Doc. #95-2 at 3-4 (¶ 5).

[23] Doc. #95-2 at 3-4 (¶ 5).

[24] Doc. #95-3 at 2; Doc. #100 at 10-13.

[25] Doc. #100 at 13-14.

I will discuss more details of Clark's testimony and medical records in the next section after addressing the governing legal standards.

DISCUSSION

It is a basic principle of law that a plaintiff's claim against a defendant must be filed within a reasonable time of the defendant's alleged wrongful acts. For this reason, the law prescribes certain time periods known as "statutes of limitations" that govern the time when a plaintiff must file a lawsuit. As the Second Circuit has explained, "a statute of limitations is intended to prevent plaintiffs from unfairly surprising defendants by resurrecting stale claims," and accordingly "prevents such surprises by extinguishing a plaintiff's remedy after he has slept on his claim for a prolonged period of time." *City of Pontiac Gen. Employees' Ret. Sys. v. MBIA, Inc.*, 637 F.3d 169, 175 (2d Cir. 2011).[26]

A 3-year statute of limitations applies to federal civil rights claims that are brought in Connecticut under 42 U.S.C. § 1983. *See Walker v. Jastremski*, 430 F.3d 560, 562 (2d Cir. 2005).[27] Clark likewise concedes that all of her corresponding state law claims are subject to statutes of limitations not longer than three years.[28]

A statute of limitations ordinarily begins to run at the point in time when a claim "accrues"—that is, when a plaintiff is aware or should be aware of being injured by the defendant's wrongful act. *See Singleton v. City of New York*, 632 F.2d 185, 191 (2d Cir. 1980).

---

[26] For purposes of readability, my quotations from court decisions in this ruling omit internal citations, quotation marks, and bracketing unless otherwise noted.

[27] This 3-year limitations period is borrowed from the Connecticut statute of limitations for personal injury claims. *See Walker*, 430 F.3d at 562 (citing Conn. Gen. Stat. § 52-577). Although Connecticut law allows for a longer limitations period for certain types of sexual assault claims, *see* Conn. Gen. Stat. §§ 52-577d and 52-577e, Clark does not argue that any of these longer limitations periods should apply to her claims.

[28] Doc. #100 at 147. Clark makes no argument why the statute of limitations analysis for her state law claims should be different than for her federal law claims.

Clark was aware of the acts taken by Hanley to sexually assault her, and her complaint does not allege any wrongful acts taken by any of the named defendants that occurred after August 2011 and that serve as the basis for her claims. Therefore, it is not disputed that all of Clark's claims accrued no later than August 2011.

But Clark did not file this lawsuit until October 26, 2018. This was more than four years after the 3-year statute of limitations presumptively expired in August 2014. Clark maintains, however, that the statute of limitations should be equitably tolled until at least October 26, 2015—three years before she filed her complaint in this action.[29]

A statute of limitations may be subject to equitable tolling, but only in "rare and exceptional circumstances," where there are "extraordinary circumstances [that] prevented a party from timely performing a required act," and only if "the party acted with reasonable diligence throughout the period he sought to toll." *Walker*, 430 F.3d at 562. "Generally, a litigant seeking equitable tolling bears the burden of establishing two elements: (1) that he has been pursuing his rights diligently, and (2) that some extraordinary circumstance stood in his way." *Smalls v. Collins*, 10 F.4th 117, 145 (2d Cir. 2021). "The term 'extraordinary' refers not to the uniqueness of a party's circumstances, but rather to the severity of the obstacle impeding compliance with a limitations period." *Ibid.*

As noted above, Clark alleges two related grounds for equitable tolling: (1) that she feared retaliation if she filed a complaint, and (2) that her mental condition in light of the trauma she experienced impeded her ability to file a lawsuit. I will consider each in turn.

---

[29] Doc. #100 at 138.

### *Retaliation*

Among the extraordinary reasons that may justify equitable tolling of a statute of limitations is a defendant's efforts to threaten or retaliate against a plaintiff if she files a claim against him. As Judge Karas has explained, "in the prison context, reasonable fear of retaliation may be sufficient to constitute extraordinary circumstances warranting equitable tolling, particularly if the person threatening retaliation is a defendant or another official who could be or was influenced by a defendant." *Davis v. Jackson*, 2016 WL 5720811, at *11 (S.D.N.Y. 2016). "But that is not to say that every inmate is entitled to equitable tolling merely because he resides in an environment that intrinsically works to his disadvantage," and "[g]eneralized allegations of fear of retaliation, therefore, are not sufficient to establish 'extraordinary circumstances' warranting application of equitable tolling." *Ibid.*

Clark did not testify—and there is no evidence—that any of the named defendants engaged in any threat of retaliation against Clark if she filed a legal claim against them or that they took any other action to prevent her from filing a claim.[30] Instead, Clark's argument for equitable tolling relies on her speculation that the defendants intended to retaliate against her. She testified that from time to time she would see other correctional officials who she believed were friendly with Hanley or Manley and that these officials insulted her or just generally made her feel uncomfortable.[31] She did not testify that any of these officers threatened her; instead, she thought the threats were implied.[32]

---

[30] *Id.* at 74-75, 76-77, 80, 82, 84.

[31] *Id.* at 28 (testifying that, during her time back at MacDougall for two weeks in late 2011 and early 2012, unnamed officers would "call me disgusting" and "fag[g]ot" and "they would laugh at me because of what happened"); *id.* at 39-40 (testimony about seeing such officers "every few days" at Cheshire).

[32] For example, as to an unnamed officer at Cheshire, I asked Clark: "I didn't hear you say anything about that person actually threatening you as distinct from insulting you. Did that person threaten you?" *Id.* at 82. She responded: "Well, it feels threatening at the time when it's happening," and "[y]ou know, it's like you just want to

Clark identified only two of the officers by name, and she did no more than speculate that these officers had a vendetta or plan to intimidate her against filing a lawsuit.[33] For example, Clark testified that she feared retaliation from Manley on the ground that she was repeatedly insulted while at Cheshire in 2012 by an unnamed officer (*e.g.*, "he would say things to me about how disgusting I was") who had previously worked in the Intelligence Unit at MacDougall, and she surmised that this unnamed officer would be "acquainted" with Manley.[34] But she did not testify that this officer ever threatened her, and she did not furnish any basis to conclude that this officer was anything more than an acquaintance of Manley's.[35]

Moreover, she acknowledged that Manley was part of the team of internal prison investigators whose actions brought to light Hanley's sexual abuse of her and who insisted that she speak with the Connecticut State Police about the allegations.[36] In light of Manley's role in doing what Clark conceded was "the right thing" to expose Hanley's wrongful sexual abuse, Clark had no coherent explanation when asked why Manley would wish to dissuade her from filing a legal action to vindicate her right against sexual abuse.[37]

---

run away … and just die while he's doing that." *Ibid.*

[33] *Id.* at 28-29 (stating that Officer Trowbridge "would have been acquainted with Corrections Officer Hanley" because "Hanley knew everyone in the facility" and "[he] was on friendly terms with all the officers"); *id.* at 39-40 (stating that there were "a dozen or so" officers she saw at Cheshire who had been at MacDougall but identifying only "Correction Officers Vamos and Trowbridge" by name). Clark said that Hanley was "particularly close" with someone named Officer Vamos who she later saw at Cheshire. *Id.* at 15. Counsel for Clark argued that Clark "experienced particular trauma when she would see [him]," but then when asked if Vamos "did anything" or "ma[d]e fun of her," counsel stated "I don't think anything specific as to Vamos is in the record on that, Your Honor." *Id.* at 143.

[34] *Id.* at 38. Clark testified that this officer "would have been acquainted with Correctional Officer Manley … [b]ecause he was in Intelligence and it's like a little unit" and "[s]o they would know each other." *Id.* at 38-39; *see also id.* at 80 (testifying that when she saw "intelligence officers in the hallway," she "immediately just thought of Manley" and others "[b]ecause they're connected").

[35] *Id.* at 83.

[36] *Id.* at 78-80.

[37] *Id.* at 80-83.

In any event, Clark never reported any of the alleged insults made to her by any officers, much less any belief she purportedly had that these officers were trying to intimidate her from filing a court action against any of the named defendants in this action.[38] As Judge Karas explains, a court should "be hard pressed to conclude that [a prisoner] exercised reasonable diligence in pursuing his rights if, for the entire time [a prisoner] alleges he faced a threat of retaliation, he did nothing to seek protection from that threat of retaliation." *Davis*, 2016 WL 5720811, at *11.

The record includes extensive medical records of Clark's interactions with prison mental health professionals.[39] None of Clark's medical exhibits disclose any statements by Clark about prison officials insulting her, threatening to retaliate against her for reporting Hanley's sexual abuse, or otherwise seeking to discourage her from asserting her legal rights against Hanley or others responsible for her sexual abuse.

In short, Clark has failed to carry her burden to establish equitable tolling on grounds of her fear of retaliation. Her testimony that she actually feared retaliation if she filed this lawsuit was not credible. She has failed to show that any fear of retaliation was an extraordinary circumstance that justified her years-long delay in filing this lawsuit or that she acted with reasonable diligence to file this lawsuit notwithstanding any fear of retaliation.

### *Mental condition*

The Second Circuit has ruled that "[e]quitable tolling is generally considered appropriate … where a plaintiff's medical condition or mental impairment prevented her from proceeding in

---

[38] *Id.* at 29.

[39] The Department of Correction disclosed more than 1,400 pages of Clark's medical records. *Id.* at 164. Clark introduced many of these sealed medical records as hearing exhibits. *See* Doc. #95-1 at 2 (exhibit list); Docs. #95-4 to #95-18 (Pl. Exs. 3 to 17).

a timely fashion." *Zerilli-Edelglass v. New York City Transit Auth.*, 333 F.3d 74, 80 (2d Cir. 2003). "The issue of whether a mental disability warrants equitable tolling of a filing deadline requires a highly case-specific inquiry." *Brown v. Parkchester S. Condominiums*, 287 F.3d 58, 60 (2d Cir. 2002). While "the trauma of sexual abuse, particularly by one's jailors, can and often does persist for many years … a plaintiff's experience of trauma, even significant trauma, cannot on its own legally justify the potentially indefinite tolling of a statute of limitations." *Stone #1 v. Annucci*, 2021 WL 4463033, at *12 (S.D.N.Y. 2021).

Clark testified that she was traumatized by Hanley's abuse and, more generally, that she was subject to depression and gender dysphoria. Although I do not doubt the evidence that Hanley abused Clark and that Clark was also deeply depressed—at times to the point of self-harm—as well as conflicted about her gender, the evidence falls well short of showing that these factors prevented Clark from timely filing her lawsuit or that Clark exercised reasonable diligence notwithstanding these factors.

As to the trauma stemming from Hanley's sexual abuse, the assaults on Clark were plainly unlawful, wrong, and abusive. But these assaults were not physically coercive or made under threat of harm or retaliation.[40] They were unlike a violent sexual assault or rape that would likely result in the most severe type of psychological trauma.

Most significantly, the record does not support Clark's contention that the abuse by Hanley was of such a nature that Clark could not bring herself to talk about the incidents or file a court action. It is true that Clark was initially reluctant to speak with prison investigators, but she ultimately decided to do so and then to describe each one of the incidents in extensive detail.[41]

---

[40] Doc. #95-2 at 3-4 (¶ 5); Doc. #100 at 75.

[41] Doc. #95-2 at 2-4 (¶¶ 4-5).

Indeed, the Connecticut State Police affidavit states that Clark herself "requested to speak to a state trooper to file a complaint."[42]

But there is yet more that cuts against Clark's equitable tolling claim. In November 2011, within just a few months of Hanley's sexual assaults, Clark signed a *pro se* petition for a writ of habeas corpus.[43] Her petition complains that her trial attorney rendered ineffective assistance of counsel in connection with her guilty plea, resulting in a 75-year sentence of imprisonment which she was allegedly not told would be imposed.[44]

The fact that Clark had the wherewithal to file a habeas corpus petition strongly weighs against a conclusion that Clark was so psychologically immobilized that she lacked the ability at that time to file a federal civil rights complaint to seek relief for Hanley's sexual abuse. Clark tried to blame her filing of the habeas corpus petition on an unnamed cellmate who "prided himself on being a legal scholar" but who "was very controlling" and "very overbearing" and "actually assaulted me" and "made me feel horrible for not challenging my conviction."[45] This aspect of Clark's testimony was neither plausible nor credible.

If Hanley's abuse of Clark was so traumatic that it prevented Clark from filing a court action for seven years, one would reasonably expect some sign of this trauma to surface in the extensive notes of conversations between Clark and prison mental health counselors. But, as I

---

[42] *Id*. at 3 (¶ 4). When I asked Clark at the hearing about this statement from the arrest warrant affidavit, she denied having made any such request to speak to a trooper to file a complaint. Doc. #100 at 75-76. I do not believe her. This statement appears in an official police report that Clark herself chose to introduce as evidence at the hearing without any disclaimer as to its accuracy in her papers or during her direct examination.

[43] Doc. #95-19 at 2-8 (Pl. Ex. 18). The signed petition itself is undated but reflects a file-stamp date of February 8, 2012. *Id.* at 4. An accompanying signed and notarized request for appointment of counsel is hand-dated November 10, 2011. *Id.* at 7.

[44] *Id*. at 8.

[45] Doc. #100 at 122-23.

confirmed with Clark during her testimony, the notes make no mention at all of any trauma from

Hanley's assaults:

> THE COURT: Let's put it this way: If we were
> to go through each and every one of these medical records
> that you've submitted, that you went through and your
> counsel went through, would we find a mention there where
> you said I'm under stress and pressure from the sexual
> assaults that were committed by Mr. Hanley?
>
> THE WITNESS: I don't think so. No. I don't
> think so.[46]

Instead of reflecting ongoing trauma from Hanley's sexual abuse or concerns about

retaliation Clark might suffer if she filed this court action, the medical notes for the two-year

period from December 2011 through December 2013 reflect Clark's complaints and concerns

about a wide range of other topics:

- **December 2011.** In December 2011, Clark complained that she did not like it at
  Corrigan where she had been transferred after Hanley's assaults at MacDougall.
  She insisted that she wanted to "go to Garner general population" because "[t]here
  are no programs here."[47] So she went on a hunger strike, threatening "I will not
  eat until I get transferred to Garner" and stating "I am miserable here."[48] She
  stated: "I have written a lot of people CCS Danis, the Warden, and Pop Mgmt
  Lynn Millings. I don't want to go to MacDougall."[49]

- **January 2012.** By January 2012, Clark had been transferred back for a brief stay
  at MacDougall. She underwent a suicide risk assessment. Clark indicated that she
  planned to hang herself "as soon as I go back to my cell."[50] When asked what had
  happened "to bring on thoughts to harm yourself," the form reflects Clark's

---

[46] Doc. #100 at 87-88.

[47] Doc. #94 at 4 (Pl. Ex. 4).

[48] *Ibid.*

[49] *Id*. at 2 (Pl. Ex. 3).

[50] *Id*.at 14-15 (Pl. Ex. 8).

answer that she "just got sick of this place" and that she "d[id]n't feel like living."[51] Among long-term verified risk factors, the form noted Clark's long sentence of 75 years and low likelihood of being reunited with her children or spouse.[52]

- **December 2012.** After a brief stay at Garner, Clark was anxious when she arrived at Cheshire in January 2012, reporting that she was "not feeling too good about being here" because she "didn't want to leave Garner."[53] But by December 2012—now more than a year after Hanley's assaults—she reported that she was "doing fine" at Cheshire.[54] She "denied any major distress" and told the clinician that she "spends [her] time writing poetry," "[w]ants to participate in the writing group," and is "looking forward to soccer season."[55]

- **April 2013.** By mid-April 2013, Clark submitted a written request for counseling to "talk about [her] crime and missing [her] children."[56] During this counseling session, Clark said "I miss my kids, but don't regret what I did."[57] She "[d]enied psychiatric distress and none was noted."[58] Clark then "processed [her] life events surrounding [her] crime."[59] The clinician added that "[i]nitially [Clark] was a bit

---

[51] *Id.* at 14.

[52] *Ibid.* Another acute risk factor documented on the form is a "recent stressor," without further explanation. Clark suggested that the recent stressor might be Hanley's sexual assaults in mid-2011. Doc. #100 at 92. But nowhere in the assessment form or contemporaneous notes from infirmary staff is there any indication that Clark mentioned her sexual assaults or resulting trauma.

[53] Doc. #94 at 19 (Pl. Ex. 10).

[54] *Id.* at 21 (Pl. Ex. 11) (entry for 12/31/12).

[55] *Ibid.* Clark testified that she lied to Cheshire mental health staff about "doing fine" so that she would not have to relive her sexual assaults and resulting trauma, especially because she felt that the staff were not listening to her and might actually divulge her confidential statements to corrections officers from MacDougall, leading to retaliation against her. Doc. #100 at 95-96, 98. This explanation was not credible, and I conclude that Clark falsely testified that she lied because she realized how damaging the notes of her statements to the mental health staff at Cheshire were to her claim for equitable tolling in this case.

[56] Doc. #94 at 21 (entry for 4/10/13).

[57] *Ibid.* Clark testified that this was a misleading summary of what she actually said, which she claimed was in response to abrasive treatment by the clinician. Doc. #100 at 100. But she was not sure whether or not she had actually said these words, which she admitted appear in quotes in the clinical record. *Id.* at 100-01.

[58] Doc. #94 at 21.

[59] *Ibid.*

closed down, but once [she] let [her] defenses down, [she] spoke freely and openly," and that she denied suicidal ideation.[60]

- **December 2013.** By mid-December 2013, Clark was telling a mental health clinician at Cheshire how she refused to work for the Department of Correction's sign shop anymore, stating: "It's immoral to make us work for less than minimum wage and to sell our goods for money."[61] She discussed her "frustration over [the] legal system, DOC, [her] ex-wife," and "[her] charges."[62] The clinician observed that Clark "appears very indignant about being found guilty of murder and having been sentenced to 75 years," and recorded Clark's extensive complaints about going through metal detectors and being strip searched at random as well as Clark's view that "[t]here shouldn't be prisons."[63]

All in all, these treatment notes do not reflect concerns about trauma from sexual abuse or retaliation from Hanley or any other defendant. To the contrary, they show Clark's willingness to advocate for herself in prison by going on a hunger strike, writing a complaint to the warden, and protesting prison labor conditions—each of which risked retaliation by prison officials.

Although Clark's burden is to prove that the limitations period should be tolled through October 2015, she has not introduced any medical records at all for 2014 or 2015. The rest of the medical records introduced by Clark at the evidentiary hearing are from April 2016 and later—in other words, from dates long *after* the three-year limitations period that began no later than August 2011 had already expired.[64] I have considered them, but they are of limited usefulness because there are none that are close in time to when the limitations period expired in August 2014.

---

[60] *Ibid*.

[61] *Id*. at 23 (Pl. Ex. 12).

[62] *Ibid*.

[63] *Ibid.*

[64] *See id*. at 25 (Pl. Ex. 13) (entries for 4/8/16, 4/12/16, and 4/21/16).

In any event, the later records are not helpful to Clark. There is one medical note from October 2017 stating that Clark is "focused on habeas appeal at present, objective is to have a trial granted [in] hope of a [lower] sentence (currently doing 75 yrs. on a plea bargain)."[65] This note is significant—but works against Clark—because it shows that she was able to focus at that time on seeking relief in state court proceedings a full year before she got around to filing her federal civil rights action in this case in October 2018.

Clark testified that she has long had gender dysphoria and that she did not feel comfortable filing this action until after her transfer to Garner in July 2016 and after she "came out" about her condition (following her attempt to castrate herself with nail clippers).[66] Although I credit Clark's claim that she suffers from gender dysphoria, the evidence does not show that her dysphoria or any other underlying mental condition prevented her from filing this lawsuit within the three years of Hanley's assaults from August 2011 to August 2014.[67]

All in all, Clark has failed to carry her burden to show grounds for equitable tolling. She claims fear of retaliation, but she has not proved that any of the defendants threatened her or took any steps to impede her filing of this lawsuit, and she has not otherwise substantiated her claim of a genuine fear of retaliation. She claims a debilitating mental condition from the trauma of Hanley's sexual abuse, but she cannot credibly explain why—were that the case—she was nonetheless able to seek court relief by filing a habeas corpus petition within months of these assaults.

---

[65] *Id*. at 34 (Pl. Ex. 17) (first entry for 10/8/17).

[66] Doc. #100 at 46, 49, 132.

[67] I have also taken into account the arguments advanced in an amicus brief filed by the New Haven Pride Center about how transgender prisoners in general may be particularly reluctant to report abuse and vulnerable as well to retaliation. Doc. #82-1.

Although Clark more generally has significant mental health issues, the evidence does not show that these issues prevented her from timely filing a complaint. Her claim for equitable tolling is undermined by prison mental health records lacking any reference to her alleged retaliation concerns or trauma from Hanley's assaults. Finally, Clark's testimony at the evidentiary hearing on these critical points was not generally credible or persuasive.

CONCLUSION

For the reasons set forth in this ruling, the Court GRANTS the defendants' motions to dismiss. Docs. #67, #69, #70. The Court DISMISSES this action with prejudice on the ground that all claims are barred by the applicable statutes of limitations.

The Court appointed *pro bono* counsel to represent Clark and Hanley. Clark was represented by attorney Benjamin H. Diessel of the law firm of Wiggin & Dana. Hanley was represented by attorney Stuart M. Katz of the law firm of Cohen & Wolf, P.C. The Court expresses its appreciation to both counsel for their exemplary representation of their clients in this action.

The Clerk of Court shall close this case. It is so ordered.

Dated at New Haven this 13th day of January 2022.

/s/ *Jeffrey Alker Meyer*
Jeffrey Alker Meyer
United States District Judge